UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

BRIAN STEGER,

    Plaintiff,                                          Case No. 20-CV-435

v.

METALCRAFT OF MAYVILLE, INC.,

    Defendant.

### DEFENDANT'S RESPONSES TO PLAINTIFF'S SECOND SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

Defendant Metalcraft of Mayville, Inc. ("Metalcraft" or "Defendant") responds to the Second Set of Interrogatories and Requests for Production of Documents ("Discovery Requests") from Plaintiff ("Mr. Steger" or "Plaintiff"), as follows:

### **GENERAL OBJECTIONS**

The following General Objections are applicable to, and hereby incorporated by reference into, each of Defendant's responses to the Discovery Requests. Defendant's provision of a response is not intended to waive any of these objections.

1. Defendant objects to each and any requests that is overly broad, vague, ambiguous, unduly burdensome, or that seeks information that is neither relevant nor proportional to the needs of the case.

2. Defendant objects to each request that fails to provide a relevant time period for the request on the ground that such failure makes the request vague, overly broad, and unduly burdensome and seeks information which is irrelevant, immaterial, and not proportional to the

needs of the case. Unless otherwise indicated, Defendant's responses are limited to the relevant time period.

3. Defendant objects to each and any request that seeks legal conclusions or that is more properly considered a Request for Admission.

4. Defendant objects to the Discovery Requests to the extent they purport to impose obligations on Defendant inconsistent with or additional to those imposed by the Federal Rules of Civil Procedure.

5. Defendant objects to the Discovery Requests to the extent they purport to demand information not in its possession, custody, or control or to require Defendant to undertake efforts to respond to the Discovery Requests that are not proportional in this matter and/or not reasonably calculated to ascertain information responsive to one or more of the specific requests.

6. Defendant objects to the Discovery Requests to the extent they call for information that is protected from discovery by the attorney-client privilege, work product doctrine, or any other applicable privilege. Defendant thus objects to divulging any such information in response to such requests. To the extent any such information is or may be divulged in response to the Discovery Requests, the divulging of any such information is inadvertent and is not to be deemed a waiver of the privilege in question (or any other applicable privilege) with respect to the divulged information or any other information.

7. Defendant objects to the Discovery Requests to the extent they call for the disclosure of information which is barred by law or which would invade the legitimate privacy interests of third parties. Defendant thus objects to divulging any such information in response to such requests. To the extent any such information is or may be divulged in response to the Discovery Requests, the divulging of any such information is inadvertent and is not to be deemed

a waiver of the objection in question (or any other objection) with respect to the divulged information or any other information.

8. Defendant objects to divulging any information falling within one of the General Objections set forth herein or any of the specific objections contained in the responses set forth below. To the extent any such information is or may be divulged in response to the Discovery Requests, the divulging of such information is inadvertent and is not to be deemed a waiver of the objection in question (or any other objection) with respect to the divulged information or any other information. Moreover, Defendant's responses to the Discovery Requests and the information divulged therein are being provided without waiver or prejudice to Defendant's right, at any other time, to raise objections to: (a) any further demand for discovery involving or relating to the matters raised in the requests; or, (b) the relevance, materiality or admissibility of (i) the discovery requests, or any part thereof, (ii) statements made in these responses and objections to the Discovery Requests, or any part thereof, and/or (iii) any information divulged in these responses and objections.

9. Defendant objects to the Discovery Requests to the extent they purport to demand production of any documents containing confidential or proprietary information.

10. The responses set forth below and the information Defendant provides therein are based upon information now available to Defendant after having made diligent efforts to ascertain information responsive to the specific requests. Defendant may, in the future, identify or determine additional information responsive to the Discovery Requests.

11. Defendant reserves the right at any time to revise, correct, add to, supplement, modify, or clarify the responses set forth below or the information contained therein, although

Defendant does not hereby undertake to do so except to the extent required by the Federal Rules of Civil Procedure.

12. Defendant's counsel is prepared to confer with Plaintiff's counsel in an attempt to resolve any general or specific objections to Plaintiff's Discovery Requests.

**OBJECTIONS TO DEFINITIONS**

1. Defendant objects to Definition No. 8 as overly broad and unduly burdensome. Defendant also objects to Definition No. 8 to the extent it purports to require the production of documents not in the possession, custody, or control of Defendant. Unless otherwise indicated in this pleading, Defendant will interpret "you," "your," or "Defendant" to mean Metalcraft of Mayville, Inc.

**RESPONSES TO INTERROGATORIES**

**INTERROGATORY NO. 1:** Identify each instance where any hourly employee of Defendant was subject to formal or informal discipline, coaching, instruction, or training relating to working off-the-clock, working prior to their scheduled start time, working after their scheduled end time, or working unauthorized overtime, including identifying each person with knowledge of the discipline, coaching, instruction, or training and any documents relating to the discipline, coaching, instruction, or training.

**RESPONSE NO. 1:** Defendant objects to this request as it is unduly burdensome and meant to harass. First, there is no time limits on this request, and it is exceedingly open ended with multiple years for any such search for information and Defendant has policies for discipline and instruction not to work during the gap/grace periods for decades. Next, the number of employees subject to this interrogatory exceeds 1,000 employees and each employee is given both formal and informal training regarding the Defendant's timekeeping system which could result in literally

4

many more than 1,000 employees and several thousand, if not tens of thousands, of transactions or incidents of instruction involving working and the compensation of each employee. Next, because of the turnover in employees, this request could result in thousands of additional employees that worked for the Defendant. For example, of the 25 individuals involved in this litigation, only three are current employees. Next, for the 1,000 or more employees, these instructions could have resulted in numerous coaching and instruction of compensation issues and discipline, including overtime. Next, the Defendant has a "buddy system" where experienced employees coach and train other new employees on a regular or ongoing daily basis. Next, the Defendant has "toolbox" meetings daily with all employees when time-to-time coaching and instructions for when to work, schedules and overtime policies are discussed. Next, hundreds, maybe thousands of time adjustments are made due to improper punching in and out and authorization of overtime and these incidents are often discussions with employees. Next, employees often discuss the subject of this interrogatory with supervisors and lead personnel, including individuals from Human Resources, on a regular basis from each employee or the thousand employees during orientation, plus other daily concerns and questions.

Without waiving Defendant's objections and to further illustrate the impossibility of responding to this interrogatory, examples of such inquiry could include the following thousands of transactions just involving one employee. For example, in admissions of Richard Mazurek, an employee and one of the 25 employees commencing an individual lawsuit, review the following:

1. "A Receipt/Acknowledgment" Bates stamp number DEF012053-DEF012054 and other documents DEF019459-DEF019494, DEF012084, DEF012061, DEF012131 and DEF02132;

2. DEF012133 for training;

5

3. DEF012180 for training on timecard and computer timekeeping systems;

4. DEF012186 for overtime, SAP, training and toolbox talks;

5. DEF019333 for authorization of overtime;

6. DEF019334 and DEF012181 orientation training on timekeeping;

7. Admission No. 14 on "buddy systems" training;

8. Admission No. 15 for time to time instructions;

9. DEF019380 and Admission Nos. 17, 18 and 19 regarding instructions generally;

10. DEF012185 for new employee training for SAP;

11. Admission Nos. 20, 21, 22, 23, 24, 25, 26, 27, 28 and 29;

12. DEF012101, Admission Nos. 30, 31, 32, 33, 34, 35, 36, 37, 42, 43, 44, 45, 48, 49 and 51, and all other Admissions regarding formal or informal discipline, coaching, instruction or training regarding work, when to work, the assigning or work, assignment of overtime, when to punch in and punch out, and when employees are paid.

Further, to illustrate the impossibility of responding and that this interrogatory is unduly burdensome, review Richard Mazurek's deposition for numerous examples of just one of the thousands of employees involved and responses to this interrogatory. See MC-ALL-000001 (dated July 16, 2020). Answers to questions throughout this deposition involve subjects of this interrogatory. See Richard Mazurek's deposition at pages 26-29 and numerous other answers. Also, during the 542 days he worked (Mazurek Dep. at 95), 331 punches outside of his 15-minute grace period, and instructions and informal discipline for his failure to follow punch in and out procedures. Further, for example, he was disciplined for absence to the point where he was told in writing that continued tardy and/or absences would result in termination. See Exhibits 41 and 42,

6

Case 2:20-cv-00435-NJ   Filed 11/17/20   Page 6 of 14   Document 21-6

Mazurek Dep. at 102-104. Further, another example of this request being too voluminous of an interrogatory or production of documents, is the Defendant's policy followed for decades which provides no work should or can be performed during the gap/grace period, and if done without supervisor approval, employees will be disciplined. Signed by over 900 employees and a copy is attached to Anders' Answer, as an example, as Exhibit D. All of this illustrates that it is impossible to reconstruct the hundreds of thousands of these transactions possibly relevant to answering this interrogatory.

**INTERROGATORY NO. 2:** Identify each Supervisor and Lead Person employed by Defendant at the location in which Plaintiff worked during Plaintiff's employment since March 12, 2015, including:

  a. the individual's dates of employment;

  b. the individual's job title(s) and dates within those job title(s);

  c. the individual's department(s) and dates within that department; and

  d. the individual's assigned shift and dates assigned to that shift.

**RESPONSE NO. 2:** Supervisors at the Mayville location are as follows: Kyle Beine, August 6, 2018, Production Supervisor; Allen Gramlow, Sr., September 19, 2003, Production Supervisor; Richard Peterke, January 5, 2015, Production Supervisor; Ryan Jazak, October 22, 2018, Production Supervisor; Jeffery Carter, April 18, 1994, Production Supervisor; Thomas Ferguson, January 7, 1985, Production Supervisor; Alisha Herring, October 16, 2017, Production Supervisor; Chad Hummelmeier, December 6, 2010, Production Supervisor; Timothy Lehn, June 2, 2008, Production Supervisor; Michael Maas, May 30, 2014, Production Supervisor; Bryan McKenzie, June 24, 2016, Production Supervisor; John Scharf, July 7, 2016, Production Supervisor; Scott Schwanke, January 16, 1995, Production Supervisor; Jonathan VandeBerg, May

7

23, 2011, Production Supervisor; Robert Wendt, March 20, 2012, Production Supervisor; David Olson, December 6, 2010, Production Supervisor; Timothy Peterson, April 18, 2011, Production Supervisor; Kenneth Olig, July 20, 2015, Production Supervisor.

Leads at the Mayville location are as follows: Terry Baumhardrt, July 30, 1986, Lead Robotic Welder 1S; Kenneth Beckrow, December 8, 1997, Lead Robotic Welder 1S; Mark Benzing, December 7, 1987, Lead Brake Press Op 2S; Aaron Calkins, March 26, 2019, Lead Painter 2S; Jeffery Carter, April 18, 1994, Lead Painter 1S; Michele Case, January 13, 1993, Lead Laser Op 1S; Carey Copeland, December 14, 1987, Lead Manual Welder 1S; Brian Cramer, September 13, 1993, Lead Material Handler 1S; Thomas Curley, December 19, 1994, Lead Laser Op 2S; Daniel Day, February 17, 1986, SCAG Assembler Lead 1S; Donald Dobbratz, January 8, 1996, Lead Prototype Technician 1S; Michael Eilbes, September 12, 1994, SCAG Assembler Lead 1S; Timothy Feucht, November 6, 1995, Lead Machine Center 1S; Christopher Folts, January 17, 2017, Lead Brake Press Op 3S; Christopher Geib, April 27, 1994, Lead Robotic Welder 1S; Keri Gloede, September 20, 2000, SCAG Assembler Lead 1S; Dennis Groll, December 8, 1986, Lead Manual Welder 1S; Cody Hains, November 18, 2013, Lead Robotic Welder 1S; Lonnie Hartwig, October 2, 1995, Lead Robotic Welder 1S; Kenneth Hoefs, November 30, 1992, Lead Brake Press Op 1S; Johnnie Holland, March 25, 1992, Lead Painter 2S; Tisha Indermuehle, January 26, 2000, SCAG Assembler Lead 1S; Jussell Jacob, March 31, 1986, Lead Robotic Welder 1S; James Jones, October 10, 1994, Lead Punch Press Op 2S; Jerome Kahlhamer, August 31, 1987, Lead Machine Center 1S; Travis Kleindl, November 7, 2011, Lead Laser Op 3S; Todd Krueger, June 25, 1979, Lead Manual Welder 1S; Joshua Landers, February 1, 2002, Lead Painter 1S; Steven Lange, January 17, 2000, Lead Brake Press Op 1S; Cynthia Linskens, May 21, 1979, Lead Spot Welder 1S; Michael Maas, May 30, 2014, Lead Brake Press Op 3S; Debra Moungey, September 22, 1997,

8

Lead Laser Op 3S; Russell Niemeyer, February 6, 2002, SCAG Assembler Lead 1S; Ernest Novak, October 18, 1993, Lead Material Handler 1S; Shirley Pankow, August 31, 1987, Lead Spot Welder 1S; George Pfeffer, October 6, 1997, Lead Brake Press Op 1S; Andrew Pike, July 18, 2005, Lead Robotic Welder 2S; David Pluim II, March 3, 1986, Lead Brake Press Op 1S; David Pluim III, March 28, 2014, Lead Brake Press Op 1S; Candi Quimby, January 19, 2000, SCAG Assembler Lead 1S; Joseph Raymond, April 4, 1994, Lead Punch Press Op 1S; Michael Reitz, February 6, 2012, Lead Painter 1S; Robert Ries, March 15, 1988, Lead Metal Finisher 1S; Ryan Rohde, August 22, 2005, Lead Robotic Welder 1S; Joey Schanen, May 15, 2000, Lead Laser Op2S; Christopher Schave, March 9, 1998, Lead Robotic Welder 1S; Jeanne Schmidt, November 7, 1983, Lead Laser Op 1S; Tammie Schraufnagel, June 27, 2014, Lead Production Helper 1S; Mark Schwartzmiller, December 28, 1992, Lead Shipper 1S; Renee Schwartzmiller, August 31, 1987, Lead Laser Op 1S; Terry Sobotta, February 18, 2004, SCAG Assembler Lead 1S; Roger Stange, January 11, 1988, Lead Manual Welder 1S; Victoria Stegen, November 4, 1992, Lead Receiver 1S; Troy Stofflet, January 22, 2001, Lead Painter 1S; Glen Strassman, June 6, 2014, Lead Painter 1S; Kenneth Tibbits, December 2, 2011, Lead Robotic Welder 2S; Brandon Waas, January 31, 2014, Lead Robotic Welder 3S; Darryl Wasmund, July 10, 1995, Lead Robotic Welder 1S; Anthony Weiglein, April 15, 1996, Lead Laser Op 1S; Jennifer Weinberger, May 23, 2011, SCAG Assembler Lead 1S; Dennis Welak, July 19, 1972, Lead Tool & Die Master 1S; Ronald Wesener, November 7, 1983, Master Electronic Tech Lead 3S; Robert Whitrock, November 17, 1986, Building & Grounds/6S 1S Lead; Rochele Wiese, January 18, 1993, Lead Brake Press Op 1S; Lori Zirbel, February 2, 1993, SCAG Assembler Lead 1S.

## RESPONSES TO REQUESTS FOR PRODUCTION OF DOCUMENTS

**REQUEST NO. 1:** Produce all documents relating to formal or informal discipline, coaching, instruction, or training provided to any hourly employee of Defendant for working off-the-clock, working prior to their scheduled start time, working after their scheduled end time, and/or working unauthorized overtime.

**RESPONSE NO. 1:** Defendant objects to this Request and incorporates by reference its response to Interrogatory No. 1 above.

**REQUEST NO. 2:** Produce all documents containing data from the Sequel database for See It that have been pulled, reviewed, or printed since October 20, 2017, including those documents identified during the Rule 30(b)(6) deposition of Corporate Designee Robert Struck, at 58:01-60:25 and 61:01-62:06.

**RESPONSE NO. 2:** Mr. Bob Struck has again researched your request and you have received all the data or information the company has regarding the Plaintiff's request for the Product of Documents. This was already given to you by Keith Kopplin in bates stamped thumb drives DEF000001 through DEF000004; and through DEF020700 on a thumb drive delivered on October 23, 2019 relevant to documentation regarding SeeitII, Kronos, SAP and ADP. Also, review Mr. Kopplin's written responses and his informal discovery to you on April 4, 2018, May 25, 2018 and June 1, 2018. These records correspond with many of the numbers 33613332-1, through 33613466-4 – or approximately 42 numbers and voluminous records, for the SeeItII date you already have. Also, consistent is Mr. Kopplin's statement. He has already given you all of the data for SeeItII, Kronos, ADP and SAP. Regarding Mr. Struck's testimony, here is his explanation: At the time he testified, he thought that there might be more information for SeeitII regarding the punch in and out times. Further, he was somewhat confused and believed that all of the actual time

10

of the punch in and out time was still in the records. After further research, he believes that punch in time involving the audit time was still in the system. He still believes that employee records regarding this audit are in the records you have. You asked him questions regarding exceptions (Struck Dep. at 53.) Then on page 57 of Mr. Struck's deposition, he talked about assumptions he made. Then on page 61 you discuss with him the SeeitII and information on it discussing the audit. The results of the actual punch in or the original punch in and out are in the employees' records that you have regarding audits. If an employee punches in before the 15 minute grace or the gap time or period or the non-production time, that the adjustment for non-productive time, non-work time was adjusted to the employees start or end time or work time and the original punch in the records you have as they would be if we sought out this information. You have all of our records to determine this. Mr. Struck tells me that would have been pay for regular time and not overtime, because if the employee works before their start or end time, the employee would need supervisory approval and that would have been recorded and the employee would have been paid overtime pursuant to the accurate records of the company. Therefore, the supervisor and the system recorded all work time for which the employee would be paid for time worked and that is accurately recorded in SeeitII. The punch in time, if done during the non-work time, the non-production time, the 15 minute grace of gap time during which the employee is not working, and that was adjusted to the employees start or end time that that time entry is not maintained under SeeitII, because it is not work time but rather grace or gap time. If the employee worked any time before or after their start or stop time, during the otherwise grace or gap time, they would be paid for that time worked and only if the supervisor knew or later approved the working of overtime or time outside of the start or end times. Those times are recorded and are in SeeitII, and the employee having worked outside of their start or end time would have been paid; and again, you have all of those records.

11

All employees were paid for all hours they worked, and that the employee was paid for time actually worked, minute for minute and there is no rounding of work performed, because the employee was paid from the moment the employee worked. The company, based on all of the data you have, has not rounded any work time, but the records do establish that the company has paid employees many times for all work from the moment the employee is working and then from the start or end time the employee is supposed to be working at his or her workstation at their start time or end of their work time, and you have all those records.

Further, regarding the punch-in and punch-out times in Seeit; the Seeit software was programmed to record any punch-in or punch-out that is within the gap/grace window for the employee's shift as the scheduled start or end time. However, the employees actual punch within the gap/grace window of non-worktime was not retained. At the time of Mr. Struck's deposition, he was not aware that this non-worktime was not retained. Any punch-in or punch-out is outside of the gap window is recorded for management review.

## AS TO ANSWERS TO INTERROGATORIES

As to Answers to Interrogatories, the foregoing is true and accurate to the best of my knowledge, information and belief.

_____
Ron Lock
Vice President of Manufacturing

Subscribed and sworn to before me
this 27 day of July, 2020.
_____
Notary Public, State of Wisconsin
My commission expires: 06-15-22

## AS TO THE OBJECTIONS TO INTERROGATORIES

Dated this 27 day of July, 2020.

THOMAS P. KRUKOWSKI S.C.

By: /s/ Thomas P. Krukowski
Thomas P. Krukowski (Bar No. 1013222)
116 Legend Way
Wales, WI 53183
(414) 881-4210
tkrukowski@tpklegal.com

JACKSON LEWIS P.C.
Ronald S. Stadler (Bar No. 1017450)
Jonathan E. Sacks (Bar No. 1103204)
330 East Kilbourn, Suite 560
Milwaukee, WI 53202
(414) 944-8930
ronald.stadler@jacksonlewis.com
jonathan.sacks@jacksonlewis.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 27, 2020, I caused a true and correct copy of Defendant's Responses to Plaintiff's Second Set of Interrogatories and Requests for Production of Documents, by the method below, on the following attorneys:

Larry Johnson
Summer Murshid
Timothy Maynard
Hawks Quindel, S.C.
222 E. Erie Street, Suite 210
Milwaukee, WI 53202
ljohnson@hp-law.com
smurshid@hp-law.com
tmaynard@hp-law.com


_____
Megan Stangler